**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

UNITED STATES OF AMERICA

v.                                          Case No.  4:21-mj-09-MAF

DANIEL ALAN BAKER,

     Defendant.

_____/

**<u>ORDER REGARDING PROBABLE CAUSE</u>**

Pursuant to Rule 5.1(a) of the Federal Rules of Criminal Procedure this court conducted a preliminary hearing in this case. For the reasons set forth below, this court finds that there is probable cause to believe that the Defendant, Daniel Alan Baker, committed the offense of Interstate Communication of a Threat, in violation of 18 U.S.C. § 875(c).

## I. BACKGROUND

On January 14, 2021, the government filed a criminal complaint and an affidavit in support of the criminal complaint, which charged the Defendant with Interstate Communication of a Threat, in violation of 18 U.S.C. § 875(c). Also, on January 14, based on the government's representations, Magistrate Judge Charles A. Stampelos issued a warrant for the Defendant's arrest. On January 15, 2021, the FBI executed the arrest warrant, and the Defendant had his initial appearance before

Judge Stampelos. On January 21, 2021, Defendant appeared before the undersigned for a preliminary hearing. At that hearing, the government offered the testimony of an FBI agent, and the Defendant offered the testimony of his landlord, his roommate, and a friend. The parties also offered exhibits, which were admitted without objection.

## II. DISCUSSION

Pursuant to Rule 5.1(e), a court must determine whether there is probable cause to believe that the defendant committed the charged offense. *United States v. Smith*, 928 F.3d 1215, 1243 n.21 (11th Cir. 2019) ("The purpose of a preliminary hearing is to ensure that the government has probable cause to proceed."). The purpose of the probable cause review is to ensure that the government does not subject individuals to "unfounded charges of crime" and that the government does not prosecute persons based on "whim or caprice." *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

Probable cause, however, "is not a high bar." *District of Columbia v. Wesby*, 583 U.S. ___, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)); *see United States v. $42,500 in U.S. Currency*, 283 F.3d 977, 980 (9th Cir. 2002) ("[P]robable cause is not an exacting standard."). Rather, probable cause "is a relatively low threshold of proof . . . ." *Valdez v. McPheters*, 172 F.3d 1220, 1227 n.5 (10th Cir. 1999). "Probable cause does not require overwhelmingly

convincing evidence . . . ." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996). Probable cause exists when facts and reasonable inferences drawn from those facts, are sufficient to convince a person of ordinary prudence to believe the defendant committed the charged offense. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Gerstein*, 420 U.S. at 111; *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

"Federal crimes are made up of factual elements, which are ordinarily listed in the statute that defines the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999). "'Elements' are the 'constituent parts' of a crime's legal definition—the things the 'prosecution must prove to sustain a conviction.'" *Mathis v. United States*, 579 U.S. ___, 136 S. Ct. 2243, 2248 (2016) (quoting *Elements*, BLACK'S LAW DICTIONARY (10th ed. 2014)). A probable cause analysis, therefore, should center on the elements of the charged offense. *Hall v. District of Columbia*, 867 F.3d 138, 154 (D.C. Cir. 2017); *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137-38 (11th Cir. 2007); *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333 (11th Cir. 2004). Probable cause, however, "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972) (citing *Draper v. United States*, 358 U.S. 307, 311-12 (1959)).

The government charged the Defendant with violating 18 U.S.C. § 875(c), which states:

(c) Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 875(c).

This crime, therefore, entails the following four elements:

(1) the defendant knowingly transmitted in interstate or foreign commerce a communication;

(2) the communication contained a "true" threat, that is, a reasonable person would perceive the communication to constitute a threat;

(3) the communication threatened to kidnap any person or to injure the person of another; and

(4) the defendant intended that the communication serve as a threat or knew that the communication would be viewed as a threat.

*Elonis v. United States*, 575 U.S. 723, ___, 135 S. Ct. 2001, 2012 (2015); *United States v. Dierks*, 978 F.3d 585, 591-92 (8th Cir. 2020); *United States v. Howard*, 947 F.3d 936, 946 (6th Cir. 2020); *United States v. Khan*, 937 F.3d 1042, 1051 (7th Cir. 2019); *United States v. Stevens*, 881 F.3d 1249, 1253 (10th Cir. 2018).

## A.    **First Element:  Transmission of a Communication**

The first element requires the government to establish that the Defendant knowingly transmitted a communication in interstate or foreign commerce. The

government alleged, and offered evidence indicating, that the Defendant transmitted

two communications in interstate commerce.

First, the evidence indicated—and the Defendant's attorney did not contest—

that on January 12, 2021, the Defendant created an "event" on Facebook titled

"Defend Tallahassee." In the details section, the Defendant allegedly wrote:

> Armed racist mobs have planted the Confederate flag in the nations
> Capitol while announcing their plans to storm every American state
> Capitol on or around Inauguration day. We will fight back. We will
> circle the state Capitol and let them fight the cops and take the building.
> Then we will encircle them and trap them inside. We will drive them
> out of Tallahassee with every caliber available. . . . We must encircle
> them so they cannot escape down Apalachee Parkway. Militant friends
> will . . . coral the trump terrorists into the Capitol building. The enemy
> will have high power rifles and explosives.

(Doc. 2 at 19).

Similarly, on January 14, 2021, in a comment to an article posted on the

internet—specifically on the website of a Tallahassee television station—the

Defendant posted a "CALL TO ARMS JANUARY 20TH!" (Doc. 2 at 22). At the

top of the posting was an image of what appears to be a Kalashnikov-style rifle,

commonly referred to as an "AK-47."[1] The rest of the Defendant's message states:

---

[1] Mikhail Kalashnikov designed this type of rifle for the armed forces of the Soviet
Union, and he completed his design in 1947. Thus, "AK-47" stands for "Avtomat
Kalashnikova" and denotes the year of the original design. Because the AK-47 was
used by the Warsaw Pact nations and still is used by nations and organizations who
are "unfriendly" to the United States, the AK-47 has become a symbol of violent

Armed racists have planted the confederate flag in America's Capitol as they openly declared that they WILL CONTINUE to wage an ARMED COUP at every American Capitol, including Tallahassee, on Inauguration Day.

We need ALL FLORIDA RESIDENTS to RISE UP! Here in Florida we must encircle terrorists who attack the Capitol! Let them take the capitol and fight with cops, SURROUND THEM AND TRAP THEM INSIDE!

Tally residents have answered the call to arms, including combat veterans. Join us! Help protect your community from terrorists. We WILL protect capitol RESIDENTS and CIVILIANS from armed racist mobs WITH EVERY CALIBER AVAILABLE.

This is an armed COUP and can only be stopped by an armed community!

If you're afraid to die fighting the enemy, stay in bed and live.

(Doc. 2 at 22).

Insofar as the Defendant's messages convey information in an intelligible format, they obviously constitute communications. Placing a communication on the internet in a virtual "location" that can be accessed by any member of the public—from anywhere in the United States or the world—satisfies the requirement that the communication be transmitted in interstate or foreign commerce. *See United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006) (noting that "the Internet is an

---

opposition to the United States and its citizens. A reasonable person could conclude that the Defendant's decision to place an image of an AK-47 at the top of his announcement was indicative of an intent to threaten violence.

instrumentality and channel of interstate commerce"); *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) (same); *United States v. Kammersell*, 196 F.3d 1137, 1139 (10th Cir. 1999) (holding that a threat that was transmitted over interstate telephone lines by utilizing internet service falls within the scope of 18 U.S.C. § 875(c)). The fact that the Defendant did not direct his message to a particular person makes no difference with respect to this element. "The language of § 875(c) does not require that the threat be made directly to the intended target; it simply prohibits 'any threat to injure the person of another' made in interstate commerce." *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001).

As to the knowledge requirement, there is no indication that the Defendant accidently or mistakenly posted these communications. Rather, the fact that the Defendant conveyed similar messages on two separate occasions is sufficient evidence that he acted "knowingly" and not because of a mistake on his part. *See United States v. Woodruff*, 296 F.3d 1041, 1047 (11th Cir. 2002). Furthermore, an FBI special agent testified that the Defendant stated that he posted materials online to scare people. This further indicates that the Defendant created these communications and did so knowingly.

Thus, there is probable cause to believe that the Defendant knowingly transmitted in interstate or foreign commerce the two communications quoted above.

**B.**     __Second Element:  That The Defendant Made a "True" Threat__

Second, the government must establish that the communication constituted a
"true threat," that is, one that a reasonable person would perceive as a threat. This
element is particularly important because it entails Constitutional implications. The
First Amendment generally precludes the government from prohibiting speech based
on the content of a message. *See Regan v. Time, Inc*., 468 U.S. 641, 648-49 (1984)
("Regulations which permit the Government to discriminate on the basis of the
content of the message cannot be tolerated under the First Amendment."); *Texas v.
Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the
First Amendment, it is that the government may not prohibit the expression of an
idea simply because society finds the idea itself offensive or disagreeable."). If there
is no question that a defendant's message is protected by the First Amendment, a
court should dismiss the charge as a matter of law. *United States v. Wheeler*, 776
F.3d 736, 742 (10th Cir. 2015).

There are, however, a few exceptions to the First Amendment's general
prohibition of Congress penalizing speech based on its content. *See Chaplinsky v.
New Hampshire*, 315 U.S. 568, 571-72 (1942) ("There are certain well-defined and
narrowly limited classes of speech, the prevention and punishment of which have
never been thought to raise any Constitutional problem."). Of relevance here, the
First Amendment does not prevent the government from prohibiting and punishing

speech that constitutes a true threat. *See United States v. Alvarez*, 567 U.S. 709, 717 (2012). The Supreme Court has understood the First Amendment to comport with society's need to protect itself "from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur," which true threats entail. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992). Therefore, "a threat must be distinguished from what is constitutionally protected speech." *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam). Courts must distinguish mere "political hyperbole" from a true threat. *Id.* at 708. A "true threat" is "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003).

Here, the government presented evidence sufficient to elicit probable cause to believe that a reasonable person would understand Defendant's communications to be true threats. For example, in his communication on January 12, 2021, the Defendant states plainly an intent—by himself and his "militant friends"—to use force to commit acts of violence and kidnapping or attempted kidnapping:

- "[W]e will encircle them and trap them inside." (Doc. 2 at 19).

Using force to trap a person inside a building is a kidnapping in the generic sense of the term.[2] A reasonable person certainly could perceive this to be a threat of violence and kidnapping.

- "We will drive them out of Tallahassee with every caliber available."

(Doc. 2 at 19).

The phrase "every caliber available" suggests that the Defendant and his "militant friends" will be armed with firearms. Firearms loaded with ammunition are inherently dangerous. *See Florida v. J.L.*, 529 U.S. 266, 272 (2000); *United States v. Atchley*, 474 F.3d 840, 849-50 (6th Cir. 2007). They are even more dangerous when fielded by an angry mob intent on "driving" "the enemy" from an area. This portion of the Defendant's message, therefore, could cause a reasonable person to understand that the Defendant and his "militant friends," armed with dangerous weapons, would forcefully eject persons from Tallahassee. Indeed, not only *could* a reasonable reader find this to be a threat, it is unlikely that any reasonable person would construe this as anything other than a threat of violence.

- "[O]nly an armed community can stop them!" (Doc. 2 at 19).

---

[2] Generic kidnapping entails two elements: "(1) an act of restraining, removing, or confining another; and (2) an unlawful means of accomplishing that act." *United States v. De Jesus Ventura*, 565 F.3d 870, 877 (D.C. Cir. 2009).

Page 10 of 22

This statement also could lead a reasonable person to believe that the Defendant and his "militant friends," some of whom are "armed combat veterans," will be using force and firearms to commit acts of violence.

- "We must encircle them so they cannot escape down Apalachee parkway." (Doc. 2 at 19).

Encirclement and preventing "escape" also communicate that Defendant and his "militant friends" would use force and violence.

- "Militant friends will . . . coral the trump terrorists."[3] (Doc. 2 at 19).

Expression of an intent to corral individuals is the equivalent of saying that the Defendant and his "militant friends" would use force and violence to confine these individuals against their will and prevent them from leaving the area in which the Defendant intended to detain them. This, too, could be understood as a threat of violence and kidnapping.

- "If you are afraid to die fighting . . . ."  (Doc. 2 at 19).

This statement indicates that the Defendant foresees—and intends—for death to result from his planned "event." A reasonable reader likewise would consider this to be indicative of a threat of violence, indeed, violence resulting in death. A "direct statement of personal intent is not necessary for" a court "to find that a

_____

[3] Presumably the Defendant meant "corral," as opposed to "coral."

communication conveys a threat of injury . . . ." *United States v. Dillard*, 795 F.3d 1191, 1200 (10th Cir. 2015). In assessing whether a reasonable person would consider a message to be a threat, courts must take into consideration connotations that add an additional layer of meaning to a message. *United States v. Turner*, 720 F.3d 411, 422 (2d Cir. 2013); *United States v. Shoulberg*, 895 F.2d 882, 886 (2d Cir. 1990) (upholding a threat conviction against a First Amendment challenge due to an implied use of violence and overtones of an imminent threat). Here, the Defendant makes clear that he expects death to be a result of his "event." A clear connotation is that the Defendant intends to inflict death on others and that he fully expects that he or his "militant friends" will die in the "event." Thus, this excerpt also could be considered a threat of deadly violence.

Analyzed separately, a reasonable person could understand each of these excerpts of the Defendant's message to be serious expressions of an intent to commit acts of unlawful violence. In other words, a reasonable person could understand them to be threats. But a defendant's message must be read in its full context. *Wheeler*, 776 F.3d at 743; *United States v. Bellrichard*, 994 F.2d 1318, 1321 (8th Cir. 1993). Indeed, the "meaning of a statement often turns on the context in which it is made . . . ." *United States v. Briggs*, 592 U.S. ___, 141 S. Ct. 467, 470 (2020). Read together in full context, the threatening nature of the Defendant's message is even

more apparent, because each portion of the message reinforces the implicit threat which pervades the communication.[4]

In assessing whether a communication entails a true threat, courts also take into consideration the reaction of recipients of the alleged threat. *See Watts*, 394 U.S. at 708 (noting that the Court considered the "reaction of the listeners" in its analysis). When the government is a recipient of the alleged threat, although not dispositive, a court may consider the rapidity with which the government responds to a threat.[5] *United States v. Hoffman*, 806 F.2d 703, 712 (7th Cir. 1986) (noting that the immediate response of the government was "clear evidence" of the government's perception of the seriousness of the defendant's expressed intent to carry out his threat). Here, the FBI sought a warrant to arrest the Defendant the same day that he transmitted his January 14th communication and a mere two days after his January 12th communication. This suggests that the FBI perceived the Defendant's messages to constitute real threats of violence. Although the government's understanding of a message cannot be a court's sole basis for concluding that a message constitutes a

---

[4] Because this court finds probable cause to believe that the message the Defendant communicated on January 12, 2021, constitutes a true threat, there is no need to analyze the message that Defendant communicated on January 14, 2021.

[5] Obviously, a court could not rely solely on this factor. That would pose the danger of allowing government officials to inhibit speech they oppose simply by acting promptly to arrest the speaker. When the recipient of the message is the government, therefore, this factor deserves less weight.

threat—that would be an abdication of the court's duty to determine probable cause independent of the executive branch—it is one relevant factor in the probable cause analysis.

For his part, the Defendant argues that his statements are not true threats. Rather, according to him, they are hyperbolic speech protected by the First Amendment. To the extent that the Defendant argues that the political nature of his speech insulates his threats from prosecution, even when a threat accompanies pure political speech, this comingling of threats with political speech "does not shield a defendant from culpability." *United States v. Viefhaus*, 168 F.3d 392, 396 (10th Cir. 1999); *United States v. Callahan*, 702 F.2d 964, 966 (11th Cir. 1983). Amalgamating true threats with political commentary does not immunize the former. Although there are political overtones to Defendant's messages, he explicitly included true threats within his diatribe. That is sufficient to bring the Defendant's messages within the zone of threatening speech that Congress lawfully may prohibit and punish.

The Defendant also argues that he did not intend his statements to be threats. But the government has presented evidence which creates probable cause to believe otherwise, and that is the extent of the government's burden at this stage. As to the Defendant's argument that he did not intend to commit violent acts and did not have the means to do so, a statement can be a threat even if he lacked the means to make his threat a reality and even if the speaker did "not actually intend to carry out the

threat," so long as he at least knew that others likely would perceive his communication as a threat. *Black*, 538 U.S. at 359-60; *United States v. Dutcher*, 851 F.3d 757, 761 (7th Cir. 2017) ("A true threat does not require that the speaker intend to carry it out, or even that she have the capacity to do so.").

The Defendant also contends that his statements were conditional, speculative, and contingent upon "armed racists" first attacking Tallahassee, and therefore, not true threats. The Supreme Court has cautioned that "the expressly conditional nature" of a statement must be considered in assessing whether it is a true threat, primarily when the expressed contingency likely would never occur. *Watts*, 394 U.S. 708. Here, Defendant did not make his threats explicitly contingent on some event that likely would not occur and which was beyond his control. For example, he did *not* say: "If and only if condition X occurs, then we will attack, kidnap, use firearms, *etc*." Accordingly, there is no "expressly conditional" language for this court to consider.

The Defendant is correct, however, that a reader *could* interpret his statements as being conditional. But even if the Defendant had stated his threat in conditional terms, "a statement may constitute a true threat even if it is conditional." *Dillard*, 795 F.3d at 1200. "Indeed, when a threat is used to intimidate or dissuade an individual from taking a particular action, the threat will often be contingent, with the threatener suggesting that violence will only be used if the listener fails to comply

Page 15 of 22

with the threatener's demands." *Id*. "Most threats are conditional; they are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats. They are threats nonetheless." *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990) (citation omitted).

Here, a reasonable person could understand the Defendant's threat to be a means of intimidating even peaceful demonstrators who held viewpoints that the Defendant opposed. The Defendant pejoratively refers to his intended targets as "trump terrorists," and a reasonable person could understand that to mean that any supporter of former President Trump would be targeted for violence and kidnapping. A defendant cannot escape liability merely by employing code words in his threats. *See Dillard*, 795 F.3d at 1201.

Furthermore, courts have considered conditional threats to be true threats when they specified the date and place that the threatened acts of violence would occur. *United States v. Kosma*, 951 F.2d 549, 554 (3d Cir. 1991); *Callahan*, 702 F.2d at 966. Of course, a "threat of violence does not need to be imminent" to constitute a true threat. *Dillard*, 795 F.3d at 1200. But by specifying the date and location of the threatened violence—as well as tactical instructions and noting that he would be joined by his "militant friends"—the Defendant communicated that he had engaged in preparation for the event and that his plan soon would be executed. The Defendant's specification of these details conveyed "a gravity of purpose and

likelihood of execution." *United States v. Crews*, 781 F.2d 826, 832 (10th Cir. 1986). A reasonable person would perceive the Defendant's specification of the date and location as further evidence that Defendant was making a true threat.

Accordingly, there is at least probable cause for this court to conclude that a reasonable person would perceive Defendant's messages to be threats and, therefore, that they were true threats.

## C.   <u>Third Element:  A Threat to Kidnap or Injure the Person of Another</u>

Because section 875(c) prohibits only a "threat to kidnap any person or injure the person of another," a court also must determine whether a defendant's message threatened these specific consequences. Here, as demonstrated above, the Defendant threatened kidnapping in the generic sense and injury to the person of others, including death. There is probable cause, therefore, to find this third element.

## D.   <u>Fourth Element: *Mens Rea*</u>

Finally, a court must consider whether there is sufficient evidence indicating that (1) the defendant intended that his communication serve as a threat, or (2) knew that the communication would be viewed as a threat. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012. Although "objective facts may be proved directly, the state of a man's mind must be inferred from the things he says or does." *Am. Commc'ns Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1940); *Bailey v. Alabama*, 219 U.S. 219, 232 (1911). In criminal cases, therefore, it usually is necessary to "draw inferences about a

defendant's intent based on all the facts and circumstances of a crime's commission." *Rosemond v. United States*, 572 U.S. 65, 78 n.9 (2014). In other words, a defendant's knowledge or intent usually is "inferred from circumstantial evidence." *Staples v. United States*, 511 U.S. 600, 615 n.11 (1994). A court also must be mindful that to act with knowledge "is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question." *United States v. Hristov*, 466 F.3d 949, 952-53 (11th Cir. 2006).

There is considerable circumstantial evidence indicating that the Defendant intended his communications to serve as threats and that he knew his communications would be viewed as threats:

- In 2017, the Defendant travelled to Iraq and Syria to join the "People's Protection Units" (also known as the "YPG") in fighting forces of the so called "Islamic State of Iraq and the Levant" and the Republic of Turkey. The YPG is affiliated with the Kurdistan Worker's Party, which is a Marxist terrorist organization. The Defendant remained in the Middle East from approximately 2017 to April 2019. He was filmed fighting, admitted to training others in military tactics, and told people that he was trained as a sniper. A reasonable person could conclude from this that the Defendant had the training and inclination to carry

out his threats and that he would be willing to kill people if they espoused political views or ideologies that the Defendant opposes.

- Sources informed the government that the Defendant stated that he would kill Turkish military aviators who were training in the United States as a means of helping the YPG. This, too, indicates that the Defendant expressed an intent to kill people to advance political causes that he supports. Such statements indicate that the Defendant likewise intended his messages to be threats and knew that others would perceive them as such.

- The Defendant owned two firearms, which he kept loaded with ammunition. This indicates that the Defendant had a means to carry out his threats, and thus that it was more likely he actually intended his messages as threats.

- In 2020, the Defendant traveled to various locations in the United States where violent protests and riots erupted, and there is evidence that the Defendant supported these efforts. This also demonstrates his mindset and willingness to involve himself in violence or potential acts of violence.

- The Defendant has used social media to encourage and instruct others to harm law enforcement officers. This, again, is evidence of his violent intent.

- In June 2020, the Defendant posted the following on his Facebook page: "I don't give a shit, I'm an anarchist and I want to watch capitalist society burn."

- In October 2020, the Defendant authored a Facebook post which stated: "This is war. Are you willing to take up arms with us yet? Buy guns and join us this November. We are voting from the rooftops." On the same day, the Defendant posted a notice that he had just purchased a firearm.

- In October 2020, in an article on the internet, the Defendant is quoted as saying that he is a "hardcore leftist" and that "I told them, if they really wanted a revolution, we needed to get AK's and start making bombs."

- In October 2020, the Defendant authored a post on the internet: "God I hope the right tries a coup Nov 3rd cuz I'm so fucking down to slay enemies again." In "the right context, an expression of an intent to injure in the past may be circumstantial evidence of an intent to injure

in the present or future." *United States v. Stock*, 728 F.3d 287, 300 (3d Cir. 2013).

- In November 2020, when the Defendant was having difficulty raising sufficient money to fund his education at the Tallahassee Community College, he posted a message on Facebook:  "I swear on god yall if I can't raise this money I will start robbing the rich and pedophiles too. This is my last fundraiser before I commit to organized crime."

- On January 14, 2021—despite the fact that he already owned two firearms and claimed to be impoverished—the Defendant expressed an interest in purchasing multiple firearms, including an "ak," which presumably refers to an AK-47 rifle. This was on the same day that he posted his second threat.

- The Defendant conveyed his threats on two separate dates, January 12 and January 14.[6]

- The Defendant specified a location and a date on which his threats would be executed.

---

[6] Knowledge and intent may be inferable from the very act of sending these threats. *United States v. Dancey*, 594 F.2d 905, 914 (2d Cir. 1979).

This evidence is more than sufficient to establish probable cause to believe that the Defendant intended that his communication serve as a threat and that he knew that his communication would be understood as a threat. Additionally the Defendant admitted to the FBI that had posted materials on the internet to scare people. All of this is sufficient evidence to establish probable cause as to the fourth and final element.

### III.  CONCLUSION

For the reasons set forth above, this court finds that there is probable cause to believe that the Defendant, Daniel Alan Baker, committed the offense of Interstate Communication of a Threat, in violation of 18 U.S.C. § 875(c). Pursuant to Rule 5.1(e), the Defendant is required to appear for further proceedings regarding this alleged offense.

**SO ORDERED**, at Panama City, Florida, this 25th day of January, 2021.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**